IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NATIONWIDE CONTRACTOR AUDIT )
    SERVICE, INC., )
                                    )
        Plaintiff, )
                                    ) Civil Action No. 08-08
        vs. )
                                    )
NATIONAL COMPLIANCE MANAGEMENT )
    SERVICES, INC., )
                                    )
        Defendant. )

## MEMORANDUM OPINION

In this tortious interference and unfair competition case,
Defendant National Compliance Management Services, Inc. ("NCMS"),
has filed a motion to dismiss pursuant to Federal Rule of Civil
Procedure 12(b)(2) (Docket No. 7), arguing that Plaintiff
Nationwide Contractor Audit Service, Inc. ("Nationwide"), cannot
establish the Constitutional prerequisites which would allow this
Court to exercise either specific or general jurisdiction over
Defendant. For the reasons discussed below, Defendant's Motion is
granted. However, the Court will exercise its discretion and
transfer this matter to the District of Kansas for further
consideration.

## I. **BACKGROUND**

### A. Factual History[1]

Both NCMS and Nationwide assist the oil and gas pipeline industry in complying with certain regulations established by the United States Department of Transportation ("DOT") and the Pipeline and Hazardous Materials Safety Administration ("PHMSA.") Under these regulations, any company whose work involves connecting individual consumers to the main oil or gas delivery pipeline ("a Contractor") must establish an anti-drug use and alcohol abuse prevention program for its employees who directly work on the pipelines. The Contractors must also periodically test those employees for evidence of drug or alcohol abuse and provide certifications that they have complied with these requirements. Because many Contractors are small businesses, they often join a consortium with others and engage a third-party administrator to implement the programs. NCMS and Nationwide serve Contractors by performing audits of the information provided by Contractors or third party administrators to ensure that the programs themselves meet government standards, that the drug and alcohol tests are performed in a proper, timely manner, and that each Contractor has

---

[1] Because the parties sought and were granted the opportunity to engage in limited discovery on the question of jurisdiction, the Court has considerably more detail in the record than that provided in the Complaint. The summary provided here, however, does not reflect any factual findings by the Court which affect the outcome of our decision.

2

met the standards established by the regulations, i.e., that it is a "qualified" Contractor.

Under the same federal regulations, the operators of oil and gas pipelines ("Operators") are charged with assuring that the Contractors they hire have complied with the drug and alcohol regulations. NCMS and Nationwide serve these customers by maintaining lists of Contractors who have pre-qualified under the DOT/PHMSA regulations or with requirements established by a specific Operator.

Richard L. Rippert was employed by NCMS, a Kansas corporation with a principal place of business in Hutchinson, Kansas, sometime in the early 1990s. During the first few years, their relationship included a non-compete agreement. In September 1997, however, for reasons which are not clear from the record, the agreement was terminated by mutual consent. Mr. Rippert is regarded as a well-known authority on the DOT/PHMSA drug and alcohol regulations and Plaintiff alleges that "his name and reputation are valuable to compete in the business engaged in by Plaintiff and Defendant." (Complaint, ¶ 5.)

On April 13, 2007, Mr. Rippert resigned from NCMS and, together with Pennsylvania residents Eugene Miklaucic and Pamela Siegert, formed Nationwide as of May 16, 2007. Nationwide's principal place of business is located in Cranberry Township, Pennsylvania. Soon thereafter, Nationwide sent postcards to over

3

400 Operators announcing the formation of the new company. For its part, NCMS had sent an e-mail message to many of its clients announcing Mr. Rippert's departure within a few days of his resignation. However, apparently to Mr. Rippert's profound annoyance, NCMS continued to include his name on its website, despite repeated requests that it be removed.

Robert Frankhouser manages the drug and alcohol compliance program for Equitable Resources, Inc. ("Equitable"), whose office in Pittsburgh, Pennsylvania, oversees the company's oil and gas pipelines in western Pennsylvania and West Virginia. Mr. Rippert and Mr. Frankhouser apparently knew each other from a contract between NCMS and Equitable dating back to at least 2002. In the summer of 2007, Mr. Rippert contacted Mr. Frankhouser, informing him about his new venture and offering to set up a specialized database for the Equitable monitoring program. The two worked together for several months and, Plaintiff alleges, Mr. Frankhouser was prepared to move Equitable's business to Nationwide when the company's contract with NCMS expired.

In November 2007, Mr. Frankhouser sent a letter to the president of NCMS, Vergi Geurian, in which he advised her that he intended to terminate the monitoring contract between NCMS and Equitable and asked for confirmation that the contract ended as of December 31, 2007. Ms. Geurian, understandably eager to avoid this result, contacted Mr. Frankhouser by e-mail and voice mail,

4

informing him that the contract actually terminated at the end of November and asking him what NCMS could do to keep Equitable's business. During a telephone call in late November, Ms. Geurian allegedly told Mr. Frankhouser that Mr. Rippert was still subject to a non-compete agreement which would be violated if Equitable became a customer of Nationwide. She also offered to reduce Equitable's annual service fee from $20,000 to $2,000.

Mr. Frankhouser subsequently decided Equitable would continue as a customer of NCMS for the upcoming year. When advised of this decision, Mr. Rippert asked Mr. Frankhouser if he had heard allegations from Ms. Geurian that he was still subject to a non-compete agreement. Mr. Frankhouser admitted she had made such statements, but told Mr. Rippert he had just decided not to change monitoring services in part because it was the middle of winter.

According to Plaintiff, at the time she made the statements about the non-compete agreement, Ms. Geurian knew they were false because she is both president of NCMS and the person who terminated the agreement in September 2007. Moreover, Ms. Geurian allegedly made similar false and misleading statements to Jeannie Myers, an employee of Columbia Gas Co. ("Columbia"), in Washington, Pennsylvania, and to Deborah Simmons of Centerpoint Energy Service Company, LLC ("Centerpoint") in Houston, Texas. According to Plaintiff, both Columbia and Centerpoint had previously expressed an interest in becoming Nationwide clients, but decided not to do

5

so as a result of Ms. Geurian's comments. Plaintiff contends Ms. Geurian deliberately made these statements in order to interfere with Nationwide's prospective contracts, divert its business, disparage its reputation and that of Mr. Rippert, and unfairly compete with the new company.

## B.    Procedural History

Nationwide filed suit against NCMS in the Court of Common Pleas of Allegheny County, Pennsylvania, on December 10, 2007.    In its Complaint, Nationwide first alleges that NCMS, through Ms. Geurian, knew of Nationwide's prospective contractual relationships with Equitable, Columbia, and Centerpoint, yet made false and misleading statements to representatives of those Operators with the intention of interfering with Nationwide's prospective contracts.    In Count II, Plaintiff contends that NCMS, again through Ms. Geurian's actions, willfully and deliberately engaged in unfair competition in its commercial practices and has been unjustly enriched by obtaining clients it would not have otherwise obtained but for its unlawful conduct.    In the same Count, Plaintiff alleges NCMS made false and misleading representations on its website which imply that the DOT has approved its drug and alcohol testing plans when, in fact, its plans are not approved and do not comply with current DOT regulations.    In the third and final Count, Plaintiff alleges that these actions also constitute a violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).    That

6

is, in addition to the false and misleading statements about DOT approval, Defendant violated the Lanham Act by intentionally leaving Mr. Rippert's name on its website after he was no longer affiliated with NCMS, thereby trading on his name and reputation. The intent of these false and misleading statements, which were made in interstate commerce, was to deceive customers and potential customers of both Nationwide and NCMS. In addition to monetary damages, Plaintiff seeks a permanent injunction prohibiting Defendant from engaging in any of these detrimental activities.

On January 2, 2008, Defendant filed a timely notice of removal pursuant to 28 U.S.C. §§ 1441 and 1446, based on the original jurisdiction provided to federal district courts for Lanham Act claims. 15 U.S.C. § 1121. Plaintiff did not object to removal.

On February 6, 2008, Defendant filed the now-pending motion to dismiss the complaint for lack of personal jurisdiction. At the request of Plaintiff, the Court ordered the parties to conduct reciprocal discovery limited to the issue of this Court's jurisdiction over Defendant and directed them to file briefs in support of their respective positions on the jurisdictional question. (Docket No. 13.) The motion is now ripe for decision.

## II. **JURISDICTION AND VENUE**

This Court has subject matter jurisdiction over Plaintiff's claims due to the presence of a federal question, the Lanham Act claim, and diversity of citizenship. *See* 28 U.S.C. §§ 1331, 1332.

7

Jurisdiction over the common law claims for tortious interference with prospective contractual relations and unfair competition is established pursuant to 28 U.S.C. § 1367 inasmuch as those causes of actions are part of the same case or controversy as the federal claim. The question of personal jurisdiction over Defendant is the crux of this Opinion. If we determine that this Court may constitutionally exercise personal jurisdiction over NCMS, venue is appropriate in this district inasmuch as a substantial part of the events which are alleged to have injured Plaintiff occurred in this district. 28 U.S.C. § 1391(b)(2).

## III. STANDARD OF REVIEW

A motion pursuant to Rule 12(b)(2) "is inherently a matter which requires resolution of factual issues outside the pleadings." Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 66, n.9 (3d Cir. 1984). When a defendant raises the question of whether the district court has personal jurisdiction over that defendant, the plaintiff bears the burden of showing personal jurisdiction exists. GE v. Deutz AG, 270 F.3d 144, 150 (3d Cir. 2001); Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992) ("Farino.") A plaintiff may meet this burden by "establishing with reasonable particularity sufficient contacts between the defendant and the forum state." Farino, 960 F.2d at 1223 (internal quotation omitted.) However, the plaintiff may not rest solely on its pleadings to satisfy this burden. Red

8

<u>Square Corp. v. Novik, Inc.</u>, CA No. 07-498, 2007 U.S. Dist. LEXIS 56217, *6 (W.D. Pa. Aug. 2, 2007), *citing* <u>Carteret Sav. Bank, F.A. v. Shushan</u>, 954 F.2d 141, 146 (3d Cir. 1992). "General averments in an unverified complaint or response without the support of 'sworn affidavits or other competent evidence' are insufficient to establish jurisdictional facts." <u>Vector Security, Inc. v. Corum</u>, CA No. 03-741, 2003 U.S. Dist. LEXIS 6573, *2 (E.D. Pa. Mar. 21, 2003), *quoting* <u>Time Share Vacation Club</u>, 735 F.2d at 66, n.9;[2] *see also* <u>Farino</u>, <u>id.</u> Otherwise, for purposes of deciding the motion to dismiss, this Court must "accept the plaintiff's allegations as true, and . . . construe disputed facts in favor of the plaintiff." <u>Toys "R" Us, Inc., v. Step Two, S.A.</u>, 318 F.3d 446, 457 (3d Cir. 2003) (citation omitted.)

If the plaintiff is successful in demonstrating that jurisdiction "comport[s] with fair play and substantial justice," the defendant must subsequently "present a compelling case that. . .render[s] jurisdiction unreasonable." <u>Miller Yacht Sales, Inc. v. Smith</u>, 384 F.3d 93, 97 (3d Cir. 2004), *quoting* <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 476-477 (1985). Determining the reasonableness of exercising jurisdiction requires the court to consider several factors, e.g., "the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's

---

[2] We note for the record that Plaintiff's complaint was verified by Ms. Siegert, the Chief Executive Officer of Nationwide.

9

interest in obtaining convenient and effective relief, the interest of the interstate judicial system in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." Burger King, 471 U.S. at 477; Farino, 960 F.2d at 1222.

## IV. LEGAL ANALYSIS

### A. Establishing Personal Jurisdiction Over a Non-Resident Defendant

The only issue now before the Court is whether we have personal jurisdiction over NCMS. A court faced with the question of whether personal jurisdiction may be exercised over a non-resident defendant must begin with Rule 4(e) of the Federal Rules of Civil Procedure. Pursuant to Rule 4(e), a federal court may exercise personal jurisdiction over a non-resident of the forum "to the extent permissible under the law of the state where the district court sits." Pennzoil Prods. Co. v. Colelli & Assocs., 149 F.3d 197, 200 (3d Cir. 1998) (citation omitted.) In turn, Pennsylvania's long-arm statute authorizes the exercise of jurisdiction over a non-resident "to the fullest extent allowed under the Constitution of the United States." 42 Pa. Cons. Stat. Ann. § 5322(b); see also O'Connor v. Sandy Lane Hotel, 496 F.3d 312, 316 (3d Cir. 2007), noting that Pennsylvania's long-arm statute "provides for jurisdiction based on the most minimum contact with the Commonwealth allowed under the Constitution of the United States" (internal citations omitted.) That is, as long as

the requirements of the Due Process Clause of Fourteenth Amendment to the United States Constitution have been satisfied, jurisdiction will lie over non-resident defendants in Pennsylvania. Pennzoil Prods., id. However, "[w]e cannot presume that jurisdiction is proper simply because the requirements of a long-arm statute have been met. . . . [A] court must engage in due process analysis after it concludes that a state's long-arm statute extends jurisdiction to a defendant." Id. at 202-203. Because Pennsylvania's long-arm statute "is co-extensive with the dictates of the Constitution," this Court's jurisdictional inquiry therefore "turns exclusively on whether the exercise of personal jurisdiction would conform with the Due Process Clause." Poole v. Sasson, 122 F. Supp.2d 556, 558 (E.D. Pa. 2000).

"Under the due process clause, a court may not exercise personal jurisdiction over a non-resident defendant unless there are certain minimum contacts between the defendant and the forum state." Time Share Vacation Club, 735 F.2d at 63, *citing* World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1978). The minimum contacts with the forum state must be "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quotation marks and citations omitted.) Having minimum contacts, i.e., having purposefully directed his activities toward the residents of the state, provides "fair

11

warning" to a defendant that he may be subject to suit in that forum. Burger King, 471 U.S. at 472 (internal citations and quotation omitted.) In evaluating whether personal jurisdiction exists, the Court may only consider the actions taken by the defendant individually. See Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 417 (1984) ("Unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum state to justify an assertion of jurisdiction.")

The basic principles of due process are reflected in the two recognized types of personal jurisdiction. See Marten v. Godwin, 499 F.3d 290, 296 (3d Cir. 2007). "A plaintiff may establish personal jurisdiction either by suing under a cause of action arising from minimum contacts of the defendant with the forum state (specific jurisdiction), 42 Pa. Cons. Stat. Ann. § 5322, or [by showing] that the defendant has 'continuous and systematic' contacts with the forum state, in which case the cause of action need not arise from those contacts (general jurisdiction), 42 Pa. Cons. Stat. Ann. § 5301." Star Creations Inv. Co., Ltd. v. Alan Amron Dev., Inc., CA No. 95-4328, 1995 U.S. Dist. LEXIS 11967, *30 (E.D. Pa. Aug. 18, 1995), citing Provident Nat'l. Bank v. California Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987).

General and specific jurisdiction are "analytically distinct

12

categories, not two points on a sliding scale." O'Connor, 496 F.3d at 321. In determining whether it has either general or specific jurisdiction over the non-resident defendant, a court must take "specific analytical steps." Pennzoil Prods., 149 F.3d at 200. The court first determines whether the defendant's contacts with the forum state are "systematic and continuous," i.e., sufficient to support general personal jurisdiction. Id.; see also Helicopteros, 466 U.S. at 414-415. "The threshold for establishing general jurisdiction is very high, and requires a showing of 'extensive and pervasive' facts demonstrating connections with the forum state." Componentone, LLC v. Componentart, Inc., CA No. 05-1122, 2007 U.S. Dist. LEXIS 18333, *5 (W.D. Pa. Mar. 12, 2007), quoting Reliance Steel Prods. Co. v. Watson, Ess, Marshall & Enggas, 675 F.2d 587, 589 (3d Cir. 1982); see also Provident Nat'l Bank, 819 F.2d at 437 ("[T]he plaintiff must show significantly more than mere minimum contacts to establish general jurisdiction.") In short, this higher threshold demands contacts with the forum which approximate physical presence. William Rosenstein & Sons Co. v. BBI Produce, Inc., 123 F. Supp.2d 268, 274 (M.D. Pa. 2000) (internal quotation omitted.)

In the absence of general jurisdiction, a court must determine whether the requirements of specific personal jurisdiction have been met. This traditionally involves a three-part inquiry: first, the defendant must have "purposefully directed" its

13

activities at the forum; second, the plaintiff's claim must "arise out of or relate to" at least one of those specific activities; and third, assuming the first two have been met, the court should consider additional factors "to ensure that the assertion of jurisdiction otherwise comports with principles of fair play and substantial justice." O'Connor, 496 F.3d at 317 (internal quotations and citations omitted.) The conclusion that a court has specific jurisdiction over a defendant as to one of several claims does not necessarily mean it has specific jurisdiction over all the claims. Remick v. Manfredy, 384 F.3d 248, 255 (3d Cir. 2001).

B.  General Jurisdiction

Pointing to the admission by NCMS that it has contracts with at least four Pennsylvania-based Operators, Plaintiff argues that Defendant has engaged in systematic and continuous activities in Pennsylvania to such an extent that this Court has power to exercise general jurisdiction. (Brief in Opposition to Defendant's Motion to Dismiss, Docket No. 18, "Plf.'s Brief," at 15.) Nationwide further argues that the Court should consider whether these business dealings are central to NCMS's business and how frequently interactions between the forum-based entities and Defendant occur, not the amount of income generated from those relationships or the percentage of Defendant's total business they might represent. Plaintiff also suggests that even in the absence of any physical presence in the forum, general jurisdiction is

14

established over NCMS by the fact that it provides monitoring services on a regular basis for Pennsylvania Operators and audits "hundreds" of Pennsylvania-based Contractors. (Id. at 16-17.)

In order for a court in Pennsylvania to exercise general jurisdiction over a corporation, the corporation must either (1) be incorporated in Pennsylvania or licensed as a foreign corporation in the Commonwealth; (2) consent to jurisdiction; or (3) carry on a "continuous and systematic part of its general business within this Commonwealth." 42 Pa. Cons. Stat. Ann. § 5301(a)(2). NCMS has clearly not consented to jurisdiction and contends it is neither incorporated nor licensed as a foreign corporation in Pennsylvania. (Defendant's Brief in Support of Motion to Dismiss, Docket No. 8, "Def.'s Brief," Exh. B, Affidavit of Vergi Geurian, "Geurian Aff.," ¶¶ 9-10.) Plaintiff offers no evidence to refute these contentions.

Federal courts sitting in Pennsylvania also consider the following objective criteria in ascertaining the existence of general jurisdiction over a foreign corporation, e.g., whether the defendant:

pays taxes to or files any tax returns with the Commonwealth; regularly purchases products or supplies within Pennsylvania; advertises in Pennsylvania;

maintains telephone listings or a mailing address in Pennsylvania;

owns or leases land or property within the state; or

15

maintains an agent in Pennsylvania.

Wims v. Beach Terrace Motor Inn, Inc., 759 F.Supp. 264, 269 (E.D. Pa. 1991); *see also* ClubCom, Inc. v. Captive Media, Inc., CA No. 07-1462, 2008 U.S. Dist. LEXIS 38410, *12 (W.D. Pa. May 9, 2008), and Davis v. PNGI Charles Town Gaming, LLC, CA No. 07-2352, 2007 U.S. Dist. LEXIS 94381, *6-*7 (E.D. Pa. Dec. 26, 2007).

Defendant asserts that none of these criteria applies to it except that on one occasion in 1994, an NCMS representative traveled to Pennsylvania to solicit the business of an Operator located in Allentown. Moreover, all its advertising is done via its website which is available to anyone in the world with internet access, including Pennsylvania residents. (Geurian Aff., ¶¶ 12-17.) Again, Plaintiff has not offered evidence or even argument in opposition to these averments.

Defendant asserts that it has contracts with only four Pennsylvania Operators out of its total customer base of 85 Operators nationwide (i.e., less than 5% of its customers) and that these contracts generate no more than 6% of its annual revenues. (Geurian Aff., ¶¶ 8 and 20.) Such limited contacts, it argues, are insufficient to establish general jurisdiction. As the case relied upon by Plaintiff states, "the percentage of [the defendant's] total business represented by its Pennsylvania contacts is generally irrelevant" to the existence of general personal jurisdiction over a defendant. (Plf.'s Brief at 16, *citing* Provident Nat'l Bank, 819 F.2d at 438, for the conclusion that although less than 1% of non-resident bank's loans and deposits

16

originated in Pennsylvania, the defendant's use "every business day" of a Pennsylvania bank was central to its business and constituted "substantial, continuous and systematic activity" in Pennsylvania.)

While Plaintiff regards Defendant's argument as "a non-starter," numerous courts in this Circuit have found that where the defendant had no other contacts with the state, deriving a small percentage of its revenue and/or having only a small percentage of its total market located in the forum was insufficient to confer general jurisdiction. See, for example, Davis, 2007 U.S. Dist. LEXIS 94381 at *9-*10 (fact that approximately 14-17% of defendant's slot machine customers in a membership program were Pennsylvania residents did not establish substantial and continuous contacts with the forum); New Generation Devices, Inc. v. Slocum Enters., Inc., CA No. 04-2583, 2005 U.S. Dist. LEXIS 28118, *4 (D. N.J. Nov. 15, 2005) (sales revenue of less than one percent of total sales and contacts with 11 veterinarians in New Jersey were not dispositive facts but supported the conclusion the defendant had insufficient contacts to establish general jurisdiction); Wims, 759 F.Supp. at 269-270 (fact that 25-27% of registered guests at New Jersey hotel during preceding year and 10% of its employees were Pennsylvania residents did not establish substantial and continuous contacts with Pennsylvania); Ware v. Ball Plastic Container Corp., 432 F. Supp.2d 434, 438 (D. Del. 2006) (defendant

17

who had no facilities, records or employees in Delaware but sold of 3% of its annual total bottle production there did not have continuous and substantial affiliations with the forum state); and Simplicity, Inc. v. MTS Prods., CA No. 05-3008, 2006 U.S. Dist. LEXIS 17626, *15 (E.D. Pa. Apr. 6, 2006) (sales and shipments into the forum consisting of less than 5% of total sales "falls substantially below" standard of continuous and systematic contacts.) *Compare* ClubCom, Inc., 2008 U.S. Dist. LEXIS 38410 at *13-*14 (where only 10 of its 2500-member health club customer base were located in the Western District of Pennsylvania, but long-term contracts with those 10 clubs were controlled by Pennsylvania law and defendant routinely contacted clubs to offer products, had worked with an independent contractor and advertised extensively in the district, general jurisdiction existed.)

We conclude that the revenues and percentage of business from its four Pennsylvania-based Operators are insufficient, when considered in isolation, to confer general jurisdiction over Defendant. We must consider that issue in combination, however, with Plaintiff's argument that additional minimum contacts exist as a result of the contractual relationships between Defendant and the Operators and through the audits of "hundreds" of individual Contractors in Pennsylvania. (Plf.'s Brief at 16-17.)

      1.    *Establishing Jurisdiction through Pennsylvania Operator Contracts:*  Standing alone, the fact that the defendant

18

has entered into a contract with a resident third party is insufficient to establish general jurisdiction over the defendant. *See*, e.g., <u>Mellon Bank (EAST) PSFS, N.A. v. DiVeronica Bros., Inc.</u>, 983 F.2d 551, 557 (3d Cir. 1993) ("<u>DiVeronica Bros.</u>"), concluding that "[c]ontracting with a resident of the forum state does not alone justify the exercise of personal jurisdiction over a non-resident defendant."

Nationwide has offered no evidence which would tend to prove that NCMS deliberately sought out the Pennsylvania Operators with whom it has contracts, the terms or duration of those contracts, or any other aspects thereof which would show that Defendant's contacts to Pennsylvania through the Operator contracts are "continuous and substantial." Moreover, Defendant asserts that it provides no in-state services through those contracts; rather all its operations are based in Kansas. (Geurian Aff., ¶ 11.) In a case involving a similar line of argument, the defendant in <u>Gehling v. St. George's School of Medicine, Ltd.</u>, 773 F.2d 539, 542-543 (3d Cir. 1985), provided educational services to students from all over the United States, including Pennsylvania. Although it advertised extensively in the state and received a portion of its income from Pennsylvania residents, the services which generated that income were performed in Grenada, not in Pennsylvania. The court found that this relationship was insufficient to show continuous and systematic contacts with the forum state. Similarly, although NCMS

19

provides services to Pennsylvania Operators, e.g., posting Contractors' compliance data to its website for their review, Plaintiff has come forward with no evidence to refute Defendant's claim that its services are provided from Kansas and the information is available throughout the United States, not only to Operators located in Pennsylvania. As in Gehling, while it is true Defendant derives a portion of its income from Pennsylvania-based sources, there is no evidence the services provided are specialized for Pennsylvania residents or that those Operators are central to NCMS's business.

Moreover, after NCMS and a Pennsylvania Operator enter into a contract, no further interactions seem to take place directly between the parties unless the Operator requests consulting services from NCMS. That is, all further information transfer and services are provided via the NCMS website discussed below. Mr. Frankhouser testified at his deposition that he is the only person at Equitable who communicates with NCMS regarding the work Defendant does for Equitable and he communicates with the company "very, very rarely. I might get an e-mail from [NCMS] that says hey, look, you have plumber or a contractor that's not responding or they ought to be dropped, should I drop them, and I'll respond to that. But very, very infrequently." (Plf.'s Brief, Attachment 1, Affidavit of Joseph Decker, "Decker Aff.," Exh. B at 19.) To the extent NCMS and the Operators do communicate with each other

during the course of performing the contract, it has long been held in this Circuit that "informational communications in furtherance of a contract between a resident and a nonresident [do] not establish the purposeful activity necessary for a valid assertion of personal jurisdiction over the non-resident defendant." Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prods. Co., 75 F.3d 147, 152 (3d Cir. 1995) (citations omitted.)

We find the facts of this case as alleged by Plaintiff to be parallel with those of a medical malpractice case in which the plaintiff alleged he was injured during the course of an operation performed in Toronto, Canada. See Romah v. Scully, CA No. 06-698, 2007 U.S. Dist. LEXIS 83835 (W.D. Pa. Nov. 13, 2007.) One of the defendants, the hospital at which the surgery was performed, filed a motion to dismiss based in part on lack of personal jurisdiction. The plaintiff argued that eight contracts to which the hospital was a party, at least some of which were with the University of Pittsburgh, established continuous and systematic contacts with this Commonwealth. The court (Barry-Fisher, J.) refused to exercise general jurisdiction, concluding it was well-established that "the mere existence of a contract, standing alone, does not confer general jurisdiction over a defendant." 2007 U.S. Dist. LEXIS 93835 at *20, *citing* DiVeronica Bros., *supra*, and Mickleburgh Machinery Co., Inc. v. Pacific Economic Development Co., 738 F.Supp. 159, 162 (E.D. Pa. 1990) ("It should be noted that the mere

21

entrance of a non-resident defendant into a contract with a Pennsylvania corporation does not bring the defendant within the jurisdiction of Pennsylvania courts.") As the court pointed out, "the totality of the parties' dealings, including the contract negotiations, contemplated future consequences of the contract, and actual course of dealing must be evaluated in order to determine whether the foreign defendant is subject to suit in the plaintiff's chosen forum." Romah, id. (internal quotation omitted.) Because the plaintiff had failed to present any evidence regarding the events surrounding the formation or performance of the contracts, while at the same time the defendant offered an affidavit indicating the contracts had been negotiated and executed in Canada and that all the work performed thereunder was completed in Canada, the court concluded Romah could not establish general jurisdiction with the requisite reasonable particularity by relying on the existence of contracts between the defendant and a third party. Id. at *21-*22.

Similarly, here, Plaintiff has failed to present any evidence regarding the formation, duration or other factors pertaining to the contracts which would persuade this Court that NCMS should be subject to general jurisdiction here because of the four contracts it has with Pennsylvania Operators.

    2. *Establishing Jurisdiction through Contacts with Contractors:* Nor can we conclude that the work NCMS performs in

22

auditing Contractors from Pennsylvania establishes the basis for general jurisdiction. Based on Mr. Frankhouser's testimony, Plaintiff argues that there are "hundreds" of such Contractors. Mr. Frankhouser actually testified that there were between "800 and 1500 plumbers" in Western Pennsylvania and northern West Virginia; there is no indication of how many of them are from Pennsylvania. (Decker Aff., Exh. B at 17-18.)

Plaintiff has not come forward with any evidence as to the amount of income NCMS receives from individual Contractors or third-party administrators of drug and alcohol programs. It appears the larger Contractors pay a fee directly to NCMS to participate in the auditing program, determined by the size of the employee pool to be reviewed; smaller Contractors may join a consortium to economically receive program monitoring by a third-party administrator who presumably then pays NCMS for the auditing service. Nationwide has provided only a single example of a third-party administrator in Pennsylvania, Spectrum Medical Services, Inc. ("Spectrum"), whose director of data services happens to be Plaintiff's chief executive officer, Ms. Siegert. (Plf.'s Brief, Declaration of Pamela Siegert, "Siegert Dec.," ¶ 1.) However, there is no evidence that Spectrum and NCMS have a contractual relationship, nor is there evidence regarding any fees Spectrum pays to Defendant for the auditing services.

As noted above, Plaintiff has not offered any evidence to

23

refute Ms. Geurian's affidavit in which she states that all the services NCMS provides to its clients are performed in Kansas, e.g., no one from NCMS travels to a Contractor's site in Pennsylvania or elsewhere as part of the auditing process. Instead, NCMS employees perform a "desktop audit" of information sent to the company and post the audit results to the website maintained in Kansas. Operators obtain information about those Contractors by accessing the database or by contacting the company via e-mail, telephone or facsimile transmission. (Geurian Aff., ¶ 7.) There is no evidence to show that the database itself is state-specific; that is, according to Mr. Frankhouser's testimony, an Operator based in Pennsylvania such as Equitable can access information about Contractors it has engaged in Pennsylvania, West Virginia, Virginia, Kentucky and presumably other states if it were to expand its operations elsewhere. (Defendant's Reply Brief, Docket No. 21, "Def.'s Reply," Exh. C at 26.)

Nor is there evidence of any solicitation of Pennsylvania Contractors by NCMS. The means by which a Contractor is included in the NCMS database appears to be either voluntary enrollment so the company is already in the database when an Operator is searching for a service provider in a given area (*see* website which provides an enrollment form for Contractors), or the Operator requests copies of the drug and alcohol compliance plan and testing statistics from a prospective Contractor and provides them to NCMS

24

for inclusion in the database (see Decker Aff., Exh. B at 21.) "Courts have found a lack of general jurisdiction where defendants had . . . limited contacts with the forum state due to the actions of a third party or the requirements of a contract." Lehigh Coal & Navigation Co. v. Geko-Mayo, GmbH, 56 F. Supp.2d 559, 571, n.14 (E.D. Pa. 1999); see also Gehling, 773 F.2d at 542-543, quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958) (the fact that residents of Pennsylvania applied to and were accepted for admission to the college in Grenada was "of no moment" because "the unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.")

Plaintiff has provided one example of what has been described as an e-mail sent from NCMS to "Will Putnam, a plumbing contractor that [sic] is a customer of Spectrum," the consortium organized by Ms. Siegert. (Siegert Dec., ¶ 12 and Exh. A thereto.) Nationwide argues this e-mail is evidence of how NCMS actively solicits business from Pennsylvania businesses. (Plf.'s Brief at 7.) However, we note that this e-mail is dated February 20, 2008, well after Plaintiff filed suit and there is no evidence of the events leading up to this e-mail. Nor is there any evidence - or even sworn testimony - that Will Putnam is a Pennsylvania resident, that NCMS "solicited" this business from Putnam rather than simply responded to a request for information from the plumber, or that

Putnam was a client or potential client of Nationwide. *See* Rodi v. S. New Eng. Sch. of Law, 255 F. Supp.2d 346, 351 (D.N.J. 2003) (concluding that subjecting a defendant to jurisdiction on the basis of granting requests for information did not comply with traditional notions of fair play and substantial justice.) Finally, we note that this e-mail appears to be a form document, that is, there is no indication it has been personalized for Putnam in any way (other than adding his e-mail address) and thus cannot be said to be focused on Pennsylvania even if we accept Plaintiff's implication that he is a resident of this Commonwealth.

Again, we conclude Plaintiff has failed to establish that the contacts NCMS has with Pennsylvania-based Contractors are sufficiently "extensive and pervasive" as to confer general jurisdiction over Defendant.

3. *Establishing Jurisdiction on the Basis of Defendant's Website:* Turning to Plaintiff's third argument, Nationwide contends that the website maintained by NCMS is the type of interactive website which subjects Defendant to general jurisdiction in Pennsylvania courts. (Plf.'s Brief at 17, *citing* Mar-Eco, Inc. v. T&R & Sons Towing and Recovery, Inc., 837 A.2d 512 (Pa. Super. 2003), and McCague v. Trilogy Corp., CA No. 06-887, 2007 U.S. Dist. LEXIS 18689 (E.D. Pa. Mar. 15, 2007).[3]) Relying on

³ We find Mar-Eco distinguishable on its facts and McCargue non-supportive of Plaintiff's argument. In Mar-Eco, the website maintained by a Maryland vehicle dealer allowed viewers to search the

Zippo Mfg. Co. v. Zippo Dot Com, 952 F.Supp. 1119 (W.D. Pa. 1997), and its progeny, Plaintiff contends that personal jurisdiction is proper if the defendant "clearly does business" on an interactive website such as entering into contracts with residents of foreign jurisdictions or repeatedly transmitting computer files over the internet. Because NCMS "touts itself as a one-stop shop for pipeline contractor auditing needs" and provides an opportunity for Pennsylvania-based customers to both access and post information about Contractors, its website is essential to Defendant's business. In short, Defendant's use of an interactive website for dissemination of information to those entities constitutes a continuous and systematic presence in the forum. (Plf.'s Brief at 18-19.) We find that although somewhat commercially interactive,

dealer's inventory, apply for financing, calculate payment schedules, order parts, schedule service appointments, request price quotes on specific vehicles, and exchange trade-in information with the dealer; in sum, the viewer could "handle nearly all of the financial aspects of a vehicle purchase. . .allowing [him] to shop and virtually complete the entire transaction via [his] computer." Since the website owner was clearly able to "perform a significant amount of commercial business" over the internet, the court did not hesitate to exercise general jurisdiction. Mar-Eco, 837 A.2d at 517-518. As discussed above, the website maintained by NCMS has no comparable features.

In McCague, the websites allowed users to reserve charter boat tours and purchase merchandise, but did not allow viewers to enter into contracts with Trilogy, the tour provider; the websites were not targeted at Pennsylvanians and could be accessed from any state. The court disagreed with the plaintiff that the defendant's website was essential to its business, noting that Trilogy's "bread and butter" was running sea tours, not making reservations via the internet. As discussed above, the website maintained by NCMS is even less interactive than that in McCague which the court found insufficient to confer general jurisdiction, and its "bread and butter" is providing drug and alcohol program auditing services, not maintaining an informational website.

27

the website is not targeted specifically to Pennsylvania and therefore does not establish systematic contacts sufficient for this Court to exercise over NCMS.

Numerous courts in this circuit and elsewhere have adopted a "sliding scale" described in Zippo as a tool for determining general jurisdiction[4] over a defendant whose primary or only presence in the forum is through an internet website. Although the Third Circuit Court of Appeals has not explicitly stated that use of this approach is mandatory, it has applied the basic technique and expanded upon it on at least two occasions, both, however, in the context of specific jurisdiction analyses. *See* Toys "R" Us, 318 F.3d at 452, and Wellness Publ'g v. Barefoot, No. 03-3919, 2005 U.S. App. LEXIS 6487, *8-*9 (3d Cir. Apr. 14, 2005).

In Zippo, the world-famous manufacturer of lighters located in

---

[4] As pointed out in Hlavac v. DGG Props., CA No. 04-6112, 2005 U.S. Dist. LEXIS 6081 (E.D. Pa. Apr. 8, 2005), the Zippo sliding scale was originally applied only to determine specific, not general, jurisdiction. *See* id. at *14-*15 and n.5, citing numerous cases from this circuit and others. At least one district court in the Third Circuit has explicitly stated that Zippo "may also properly be used in cases asserting general jurisdiction." Molnlycke Health Care AB v. Dumex Med. Surgical Prods. Ltd., 64 F. Supp.2d 448, 451 (E.D. Pa. 1999). The Court is not persuaded by Defendant's argument that use of the Zippo sliding scale is "questionable" (Def.'s Reply at 16, *citing* O'Connor, 496 F.3d at 321), because the Third Circuit Court of Appeals at the point cited by Defendant was clearly distinguishing between general and specific jurisdiction, not the strength of a defendant's contracts through a website. However, in the absence of direction from the Court of Appeals on the appropriate use of the sliding scale in determining general jurisdiction, this Court will discuss the approach in its general jurisdiction analysis, primarily because that is where Plaintiff implies, correctly or incorrectly, it should be used. (Plf.'s Brief at 17.)

28

Bradford, Pennsylvania, sued a California company for trademark infringement after the defendant registered a number of internet domain names that included the word "zippo." Zippo Dot Com used the websites to post various news services to which a user could subscribe by filling out an online application and paying for the subscription using a credit card. The subscriber received a password which could then be used to view or download information stored on the defendant's server in California. Of its 14,000 subscribers, approximately 2 percent were Pennsylvania residents; Zippo Dot Com had also entered into seven contracts with internet access providers based in Pennsylvania which allowed its subscribers to access the news services. 952 F.Supp. at 1121. The court (McLaughlin, J.), recognizing that in 1997, the case law on the permissible scope of personal jurisdiction derived only from internet use was in its infancy, developed a sliding scale based on its conclusion that "the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet." Id. at 1123-1124. At one end of the scale are highly interactive sites which permit the defendant and its customers to conduct a full range of business, e.g., entering into contracts with residents of a foreign jurisdiction which require "the knowing and repeated transmission of computer files." Id. At the other end are passive, informational sites which are generally

29

no more than advertising. "The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site." Id. at 1124. At the highly interactive end, jurisdiction over the defendant is appropriate because the activities carried on are analogous to more traditional activities such as entering into contracts and providing services via surface mail and repeated telephone calls. At the passive end, jurisdiction is not appropriate, based on the theory that doing so would result in "nationwide (indeed worldwide) personal jurisdiction over anyone and everyone who establishes an Internet web site," a practice which would be inconsistent with well-established personal jurisdiction case law. *See* Blackburn v. Walker Oriental Rug Galleries, Inc., 999 F.Supp. 636, 639 (E.D. Pa. 1998) (citations and quotations omitted.) Although not discussed in Zippo, courts have subsequently concluded that if the degree of website interactivity falls in the middle range, the court must also consider whether the content of the website was "purposefully directed" at residents of Pennsylvania and "central to the defendant's business" there. *See*, e.g., Molnlycke Health Care AB v. Dumex Med. Surgical Prods. Ltd., 64 F. Supp.2d 448, 452 (E.D. Pa. 1999); *see also* McCague, 2007 U.S. Dist. LEXIS 18689 at *10.

The Court has examined the entire website maintained by NCMS at www.nationalcompliance.com.[5] The site consists of seven pages, including the homepage which contains a statement of the services provided by NCMS and describes the company as the "largest provider of contractor monitoring in the gas & oil industry.[6]" From the homepage, a viewer may link to a more detailed description of the "DOT audit division" and the services provided by NCMS in assisting Operators with the Contractor pre-qualification process. Another page describes the "client-required drug & alcohol division" which provides auditing based on an Operator's specific requirements. The website provides a list of NCMS staff with their responsibilities, e-mail addresses, and telephone numbers in Kansas. Based on the Court's own experimentation, clicking on an e-mail link on that page takes the visitor out of the website to his or her own e-mail function; that is, the user does not enter a computer system controlled by NCMS in order to send e-mail. A fifth page contains some 30 different forms used to compile compliance data for specific federal programs which the client or potential client can download, complete and mail to Kansas; Kansas telephone numbers are provided if the user needs assistance. The

---

[5] Although we have no way of knowing if the website has been altered since Plaintiff filed this lawsuit, neither party alludes to any such changes; therefore we assume it has not.

[6] Contrary to Plaintiff's implication that on its website, NCMS "touts itself as a one-stop shop for pipeline contractor auditing needs" (Plf.'s Brief at 18), the Court finds no language to support this description.

31

website also includes an undated list of NCMS clients. Unless a client name includes a state or city name, e.g., Columbia Gas of Pennsylvania or El Paso Natural Gas, it is impossible to determine the forum state of any particular client. There is no list of prequalified Contractors. Finally, links on the home page designated "news" and "benefits" take the viewer to an enrollment form which Contractors can download as the first step in becoming a participant in the NCMS program. The Contractor must download the form, complete it in hard copy, and mail it to NCMS in Hutchinson, Kansas, together with the membership fee. Contractors cannot enroll by completing the form on line and paying the fee using a credit card or bank account.

The Court concludes that for non-member viewers, the website falls far toward the passive end of the Zippo scale. Most of the website pages do no more than explain the purpose and benefits of participating in the NCMS program and provide information about how to contact the company via telephone or e-mail. *See* Desktop Tech., Inc. v. Colorworks Reprod. & Design, Inc., CA No. 98-5029, 1999 U.S. Dist. LEXIS 1934, *9 (E.D. Pa. Feb. 25, 1999) (e-mail links are "the electronic equivalents of advertisements' response cards and are insufficient to make these pages more than advertisements.") If a viewer wants to become a member, he must download a form and mail it to Kansas. No contracts can be entered into on-line and until a Contractor or Operator becomes a member,

32

no information or computer files can be exchanged via the website. *Compare* Kloth v. Southern Christian Univ., 494 F. Supp.2d 273, 281 (D. Del. 2007), where the court found the ability to complete an on-line application for admission to the university was "arguably commercial" because of the relationship which could develop if the application were accepted and the potential student chose to enroll, but still declined to exercise general jurisdiction.

The NCMS homepage also includes spaces for members to enter a user name and password. The Contractor enrollment form mentioned above lists benefits of membership in the NCMS program, e.g., on-line access to one's own company information; audit results; sample approved drug and alcohol plans; the on-line ability to update statistical data, covered employee lists, supervisor training records, and background check affidavits; and the ability to view updates and opinions concerning the regulations. According to Mr. Frankhouser's testimony, Operators with NCMS contracts can access the website to view lists of pre-qualified Contractors. (Def.'s Reply, Exh. C at 27; Decker Aff., Exh. B at 20.) The contract between Equitable and NCMS (which we assume is typical) also refers to the website, stating that "contractor status information will be provided via the NCMS web site with the information being updated daily and accessible by [Equitable.]" (Decker Aff., Exh. E at 1.)

In the wake of Zippo, courts have been reluctant to find

33

general jurisdiction based on internet contacts only, even in those cases where the websites are highly interactive. *See*, e.g., <u>Pierce v. Hayward Indus.</u>, CA No. 05-5322, 2006 U.S. Dist. LEXIS 81393, *20 (E.D. Pa. Nov. 6, 2006), stating that where "the site is deemed not interactive enough, not targeted toward the forum state, not central to the defendant's business, or simply [has] no 'connexity' to the cause of action, courts have resisted asserting general jurisdiction." (*See also* cases set out in the margin below.[7]) The reasoning of the court in <u>Molnlycke</u> is instructive and applicable to the facts herein. In that case, both parties sold medical products and the plaintiff contended that the defendant's product infringed upon its own patents. The defendant's websites advertised its products generally and allowed users to sign up for

---

[7] In the following cases, courts in this Circuit concluded that general jurisdiction could not be exercised based on interactive websites in the absence of other continuous and substantial contacts between the defendant and the forum or an intention to target forum residents: <u>Kloth</u>, 494 F. Supp.2d at 281; <u>Davis</u>, 2007 U.S. Dist. LEXIS 94381 at *16-*19; <u>Adelman v. Peter</u>, CA No. 06-6007, 2007 U.S. Dist. LEXIS 94011 at *17-*20 (D.N.J. Dec. 21, 2007); <u>McCaque</u>, 2007 U.S. Dist. LEXIS 18689 at *9-*16; <u>Simplicity</u>, 2006 U.S. Dist. LEXIS 17626 at *23-*26; <u>O'Connor v. Sandy Lane Hotel Co.</u>, CA No. 04-2436, 2005 U.S. Dist. LEXIS 7397, *8-*10 (E.D. Pa. Apr. 28, 2005) (reversed on other grounds at 496 F.3d 312 (3d Cir. 2007)); <u>Hlavac</u>, 2005 U.S. Dist. LEXIS 6081 at *14-*22; <u>Yusuf v. Adams</u>, CA No. 03-76, 2004 U.S. Dist. LEXIS 27178, *9-*10 (D.V.I. Nov. 9, 2004); <u>H.A.S. Prot., Inc. v. Senju Metal Indus. Co.</u>, CA No. 03-1215, 2003 U.S. Dist. LEXIS 25172, *14-*15 (E.D. Pa. Dec. 12, 2003); <u>Brown v. AST Sports Sci., Inc.</u>, CA No. 02-1682, 2002 U.S. Dist. LEXIS 12294, *18-*28 (E.D. Pa. June 28, 2002); <u>Snyder v. Dolphin Encounters, Ltd.</u>, 235 F. Supp.2d 433, 439-441 (E.D. Pa. 2002); <u>VP Intellectual Props., LLC v. Imtec Corp.</u>, CA No. 99-3136, 1999 U.S. Dist. LEXIS 19700, *9-*11 (D.N.J. Dec. 8, 1999); <u>Blackburn</u>, 999 F.Supp. at 638-639; and <u>Grutkowski v. Steamboat Lake Guides & Outfitters</u>, CA No. 98-1453, 1998 U.S. Dist. LEXIS 20255, *10-*15 (E.D. Pa. Dec. 28, 1998).

34

additional product information and to order products by providing a credit card number. The court, applying the Zippo sliding scale in its general jurisdiction analysis, concluded, "To hold that the possibility of ordering products from a website establishes general jurisdiction would effectively hold that any corporation with such a website is subject to general jurisdiction in every state. The court is not willing to take such a step." Molnlycke, id. at 454; *see also* Quality Improvement Consultants v. Williams, CA No. 02-3994, 2003 U.S. Dist. LEXIS 2705, *18-*19 (D. Minn. Feb. 24, 2003) (if maintaining a website that advertised its services and allowed users to purchase goods online, "standing alone, were enough to satisfy International Shoe's 'minimum contacts' standard, then due process would impose little restraint on the Court's ability to exercise jurisdiction over every e-commerce entrepreneur who offers goods or services for sale online.") The Molnlycke court also concluded that while the new cyberspace technology would affect many aspects of the law, it would not make prior jurisprudence irrelevant. Relying on the fact that the Third Circuit Court of Appeals in Gehling, *supra*, had noted no evidence that Pennsylvania students were particularly solicited or that Pennsylvania was a focus of the college's promotional efforts, the court found no reason for the internet to change the requirement of a "very high showing before exercising general jurisdiction." Id. at 451-452.

Plaintiff argues NCMS should be subject to general personal

35

jurisdiction because provision of its services via the internet is the essence of its business. (Plf.'s Brief at 18-19.) As noted above, only four of NCMS's 85 Operator clients are Pennsylvania residents and its interactions with the Contractors appear to be even more attenuated in that many of them most likely occur through the intermediary third-party administrators. Plaintiff has not come forward with evidence of even a single Contractor who has been a participant in Defendant's monitoring program.[8] Nationwide depends on vague allusions to "hundreds" of such Contractors, based on Mr. Frankhouser's testimony, but some unknown percentage of those may actually be West Virginia companies or individuals and there is no evidence of how often either a Contractor or a third party administrator provides information to NCMS.

Nor will we give much weight to Plaintiff's arguments that the contacts with Pennsylvania are continuous and systematic because Defendant updates its database "daily" and provides monitoring services "on a continuous basis." (Plf.'s Brief at 6; *see also* Decker Aff., Exh. E, proposed contract between Equitable and NCMS, stating that Defendant will "perform the aforesaid monitoring services on a continuous basis as required" and will update contractor status information "daily.") Most databases of this

---

[8] This omission is particularly curious inasmuch as Ms. Siegert states that Spectrum "has had regular and systematic contact with" NCMS, apparently as a third-party drug and alcohol testing program administrator; however, no details of those contacts are provided. (Siegert Dec., ¶¶ 8-11.)

36

type would be of little value to users if they were not updated continuously, but that does not necessarily imply that NCMS updates information on Pennsylvania Contractors on a daily basis. Rather, the procedure seems to be that Contractors are required to test some percentage of their employees on a quarterly basis and report the results of those tests to NCMS which then confirms that the testing procedures complied with DOT regulations and provides the results on its website. (*See* Decker Aff., Exh. E at 1 and Contractor reporting form attached thereto.)

Plaintiff has not submitted any evidence from which this Court can evaluate the degree of interactivity between Pennsylvania residents and Defendant's website, e.g., some estimate of how often Pennsylvania Operators have consulted the NCMS website to identify Contractors, or how many Pennsylvania Contractors have submitted information to be included on the website. Without some evidence of the nature and quality of interaction between Defendant and this forum via the website, the fact that users can exchange information with Defendant is insufficient to establish general jurisdiction. *See*, e.g., Capitol Fed. Sav. Bank v. E. Bank Corp., 493 F. Supp.2d 1150, 1162 (D. Kan. 2007) (fully interactive on-line banking website held not to establish jurisdiction where the plaintiff failed to offer evidence about level of use by forum customers.)

Most importantly, there is no evidence, contrary to Plaintiff's assertion, that the website is "targeted" at

37

Pennsylvania. As the Court of Appeals stated in Toys "R" Us, even where the website is commercial and interactive, the long-standing guidelines for establishing general jurisdiction have not been abrogated by the fact that the website is accessible in the forum. "Rather, there must be evidence that the defendant purposefully availed itself of conducting activity in the forum state, by directly targeting its web site to the state, knowingly interacting with residents of the forum state via its web site, or through sufficient other related contacts." Id., 318 F.3d at 454. As another district court has pointed out, an advertising or other business campaign which aims to sell a particular product, whether it is a tangible item or a service, "cannot be deemed to be purposefully directed at Pennsylvania even if some Pennsylvania residents respond to that campaign." Molnlycke, 64 F. Supp.2d at 452, *citing* Gehling. Here, the website is apparently the primary advertising tool used by NCMS to generate its business. Here, even after a Pennsylvania resident chooses to participate in the program, the interactive functions performed between the customer and Defendant are no more "purposefully directed" at Pennsylvania than they are directed at the residents of any other state.

Despite the opportunity to conduct limited discovery on the jurisdictional question, Plaintiff has failed to provide evidence which would establish that any part of Defendant's website is targeted specifically to Pennsylvania Operators or Contractors,

38

arguing only that

> because the website involves clients giving NCMS
> information and NCMS subsequently posting responsive
> information on the website, the website is interactive in
> that it is tailored to each client's needs. Mr.
> Frankhouser testified that NCMS's website is such an
> integral part of the services NCMS provides that the
> website is used to "access any services NCMS provides."

(Plf.'s Brief at 7.)

We believe Plaintiff is conflating two aspects of Defendant's business. While it is clear use of the internet expedites the flow of information between NCMS and the Operators and Contractors, Defendant's primary business is, as stated on its website, to provide contractor monitoring in the gas and oil industry and to assist Operators with Contractor pre-qualification related to DOT alcohol and drug testing regulations. Its primary business is not analogous to that of Dot Com in Zippo whose primary business was communication of news via the internet. There is no evidence to refute Defendant's claims that its auditing services are provided from Kansas, that only a small percent of its business is derived from Pennsylvania, and that it has no other substantial contacts with this forum. The NCMS website is used to transmit information and is similar therefore to any other means of communication, whether standard mail, facsimile, or telephone.

Finally, nothing on the NCMS website reflects a conscious choice on the part of NCMS to conduct business with the residents of Pennsylvania or to intentionally interact with them via the

39

website at a level which would imply "purposeful availment" of the laws and protections of this forum. Toys "R" Us, 318 F.3d at 446, *citing* Zippo. The website is not targeted specifically to reach Pennsylvanians and is no more central to Defendant's business in Pennsylvania than it is to any other state in which the oil and gas pipeline industry functions. *See* Molnlycke, 64 F. Supp.2d at 452 (refusing to assert general jurisdiction because although the defendant's websites were "available in every state they are not necessarily targeted towards every state [and] plaintiff has made no showing that defendant's websites targeted Pennsylvania.") Furthermore, NCMS takes no affirmative action in Pennsylvania. Its only action is to make its website available to the world at large; users must take the affirmative actions of first becoming members of the service and then accessing the website from the location in which they happen to be. *See* Arriaga v. Imperial Palace, 252 F. Supp.2d 380, 386-387 (S.D. Tex. 2003) (holding that it did not have general jurisdiction over Nevada defendant who took no deliberate action in Texas, its website was not targeted specifically to reach Texans, the plaintiff failed to demonstrate that the website was central to the defendant's business, and no other "substantial, continuous, and systematic contacts" existed.)

We find a recent analysis by the Court of Appeals for the Fifth Circuit to be instructive. In Revell v. Lidov, a Texas resident sued Columbia University and the Massachusetts-based

40

author of an allegedly defamatory article which had been published on a website maintained by the Columbia School of Journalism. *See* 317 F.3d 467 (5th Cir. 2002). Revell argued that the Texas district court could assert general jurisdiction over Columbia because the website allowed users to subscribe to the school's on-line journal, purchase advertising on the website or in the journal, and submit electronic applications for admission to the school. Id. at 470. Relying on its previous holding in Mink v. AAAA Dev. LLC, 190 F.3d 333 (5th Cir. 1999) where it had applied the Zippo sliding scale, the court noted the Columbia site had some interactive elements which allowed for "bilateral information exchange with its visitors," thus requiring examination of the "extent of the interactivity and nature of the forum contacts." The court concluded the Zippo sliding scale was

> not well adapted to the general jurisdiction inquiry, because even repeated contacts with forum residents by a foreign defendant may not constitute the requisite substantial, continuous and systematic contacts required for a finding of general jurisdiction -- in other words, while it may be doing business *with* Texas, it is not doing business *in* Texas.

Id. at 471 (emphasis in original).

In a similar case, the Sixth Circuit Court of Appeals reached the same conclusion where users in Ohio could register domain names on the defendant's website, an activity which the court considered one which simply enabled the defendant to do business with Ohio residents, a fact which did not permit general jurisdiction. *See*

41

Bird v. Parsons, 289 F.3d 865, 874 (6th Cir. 2002), *citing* Bancroft & Masters, Inc. v. Augusta Nat'l, Inc., 223 F.3d 1082, 1086 (9th Cir. 2000) ("engaging in commerce with residents of the forum state is not in and of itself the kind of activity that approximates physical presence within the state's borders"), *o'ruled on other grounds by* Yahoo! Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme, 433 F.3d 1199, 1206-1207 (9th Cir. 2006) (*en banc.*)

Based on the facts that (1) Defendant's website is primarily a means to convey information; (2) Pennsylvania residents cannot enter into contracts with Defendant nor purchase services via its website, (3) the interactions in which users of Defendant's website can engage involve only the exchange of information, and (4) Plaintiff has failed to establish that Defendant's interactions with Pennsylvania residents via the website are "continuous and substantial," we conclude that the website is insufficient to allow this Court to exercise general jurisdiction over Defendant.

C.   Specific Jurisdiction

Having found no general jurisdiction, we turn to the question of whether this Court may exercise specific jurisdiction over NCMS. As noted above, "specific jurisdiction arises when the plaintiff's claim is related to or arises out of the defendant's contacts with the forum." Farino, 960 F.2d at 1221. Plaintiff first argues that this Court has jurisdiction under Section 5322(a)(4) of Pennsylvania's long-arm statute which allows specific

jurisdiction over a defendant who takes actions outside the forum which causes harm in the Commonwealth, the so-called "tort out/harm in" provision. (Plf.'s Brief at 8-12.) Nationwide alternatively argues that it has satisfied the "Calder effects test." (Id. at 12-15, *citing* Calder v. Jones, 465 U.S. 783 (1984).)

Before considering Plaintiff's arguments, we note that the Third Circuit Court of Appeals has explicitly provided that because the specific jurisdiction analysis "depends on the relationship between the claims and contacts, we generally evaluate specific jurisdiction on a claim-by-claim basis." Marten, 499 F.3d at 296 (internal citations and quotations omitted.) The only claim Plaintiff addresses in its brief is the tortious interference claim, completely ignoring parts of Count II and all of Count III of its Complaint. Count II alleges that Ms. Geurian willfully and deliberately contacted Plaintiff's "prospective and current customers" to make the false and misleading statements about Mr. Rippert's non-compete agreement and that NCMS committed further acts of unfair competition, including false and misleading representations on its website which implied that its drug and alcohol testing plans not only met the DOT's requirements, but also that its plans were approved by the DOT. (Complaint, ¶¶ 32-40.) The first part of Count II will be considered to the extent it overlaps with the allegations of Count I. However, the Court has been unable to identify any discussion of the unfair competition

43

claim based on alleged misleading statements regarding DOT approval of Defendant's drug and alcohol testing plans anywhere in Plaintiff's brief, nor in any of the affidavits or exhibits submitted in opposition to the motion to dismiss.

In Count III, Plaintiff contends that after Mr. Rippert left NCMS, Defendant intentionally left his name on its website in order to trade on his reputation as a nationally recognized authority on drug and alcohol testing programs. Customers were, and are likely to be, confused into believing that Mr. Rippert is still associated with NCMS. Moreover, they will be confused into thinking that the DOT has approved Defendant's testing plans. (Complaint, ¶¶ 41-54.) Again, there is no discussion of these alleged violations of the Lanham Act in any of Plaintiff's pleadings.

Therefore, in the absence of sworn statements or any other evidence regarding these allegations of unfair competition and false advertising through the website, the Court concludes Plaintiff has failed to establish that statements made on the website allow this Court to exercise specific jurisdiction over Defendant and we will consider only those claims arising from the exchanges between Ms. Geurian and Mr. Frankhouser in November 2007.

Although Plaintiff relies heavily on the "tort out/harm in" provision of the Pennsylvania long-arm statute, we conclude that under current Third Circuit jurisprudence, the appropriate analysis is the Calder effects test. *See* Wellness Publ'g, 2005 U.S. App.

44

LEXIS 6487 at *9 (the allegation of tortious interference with contract "calls for an application of the 'effects' test set forth in Calder"); O'Connor, 496 F.3d at 317, n.2 (the Calder test, "a slightly refined version" of the traditional test for specific jurisdiction, applies to intentional tort claims.)

In Calder, the movie and stage entertainer, Shirley Jones, brought suit for defamation and libel against the author and editor of an article in the National Enquirer, a weekly magazine with nationwide distribution. Distribution of the magazine was skewed, however, toward California where Jones lived and worked in that about 11% of the magazine issue which contained the allegedly libelous article was sold in California alone, more than twice the amount sold in any other state. Both defendants lived and worked in Florida and had few if any of the traditional contacts with California which would impose jurisdiction. The Supreme Court found, however, that the defendants could "reasonably anticipate being haled into court" there, noting that the story concerned the California activities of a California resident whose career was centered in California; the article relied on California sources; and "the brunt of the harm, in terms both of [Jones's] emotional distress and the injury to her professional reputation, was suffered in California. In sum, California is the focal point both of the story and of the harm suffered." Calder, 465 U.S. at 788-789. Moreover, the Court found the defendants had expressly aimed

their intentional tortious activity at California, that is, they knew the article "would have a potentially devastating impact" on Jones and "they knew that the brunt of that injury would be felt. . .in the State in which she lives and works and in which the National Enquirer has its largest circulation." Id. at 789-790.

In the aftermath of Calder, the Third Circuit Court of Appeals has explicitly analyzed its holding in the context of intentional business torts, including tortious interference with contracts. *See* IMO Indus. v. Kiekert AG, 155 F.3d 254 (3d Cir. 1998). In that case, the Court of Appeals thoroughly reviewed cases from other circuits addressing this issue and concluded they had adopted a narrow construction of Calder. Id. at 261-263, *citing* Far West Capital, Inc. v. Towne, 46 F.3d 1071 (10th Cir. 1995); Southmark Corp. v. Life Investors, Inc., 851 F.2d 763 (5th Cir. 1988); and Esab Group, Inc. v. Centricut, Inc., 126 F.3d 617 (4th Cir. 1997), *cert. denied*, 523 U.S. 1048 (1998); *see* other cases from the Eighth and First Circuits cited at 263. In each of those cases, the Third Circuit concluded the critical issue had been whether "the defendants had targeted (or 'expressly aimed') their conduct at the forum and thereby showed that the forum was the focal point of the tortious activity." IMO Indus., 155 F.3d at 263. The Court of Appeals determined, pursuant to Calder, that a plaintiff can show specific jurisdiction over the defendant by establishing:

1)    The defendant committed an intentional tort;

46

2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; and

3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

IMO Indus., 155 F.3d at 265-266; *see also* Remick, 238 F.3d at 258, and Marten, 499 F.3d at 297 (both applying the IMO Indus. test.)

We agree with Plaintiff that it has alleged Defendant committed an intentional tort and therefore satisfied the first prong of the Calder/Imo Indus. test. (Plf.'s Brief at 13.) However, this Court is to consider the first two elements only if the third, i.e., the "expressly aimed" element, is first met. Marten, 499 F.3d at 297. To satisfy this element, "the plaintiff has to demonstrate the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum." Id. at 298, *quoting* IMO Indus.

According to Plaintiff, Ms. Geurian "had to know" Nationwide would suffer the effects of the disparaging and false statements regarding the non-compete agreement in Pennsylvania because Nationwide is a Pennsylvania corporation and a corporation is generally held to have suffered losses at its corporate home. However, to satisfy the third prong of the effects test, simply knowing that the plaintiff's principal place of business is located

47

in the forum is insufficient. "Finding jurisdiction on that basis, alone, would render the requirements of personal jurisdiction illusory as every plaintiff suffers harm in the state where he or she resides." Fulmer Co. v. Cutworth Prods., CA No. 07-1150, 2008 U.S. Dist. LEXIS 31684, *6-*7 (W.D. Pa. Apr. 16, 2008), *citing* Marten, 499 F.3d at 298.

As the Court of Appeals concluded in IMO Indus., the defendant must manifest behavior intentionally targeted at and focused on the forum, a requirement which will typically "require some type of entry" into the forum state. IMO Indus. at 265 (internal citations omitted.) In that case, the Court found that despite seven face-to-face meetings, as well as multiple telephone calls and letters between the parties, there were insufficient contacts to establish jurisdiction over the non-resident defendants. None of the meetings occurred in New Jersey, the forum state, the written correspondence had been directed to IMO's agent in New York and forwarded to the plaintiff in New Jersey, and the telephone calls all originated with IMO. Id. at 267-268.

Here, we have even less evidence of "entry" into Pennsylvania by NCMS. Mr. Frankhouser stated that prior to the events leading up to this lawsuit, he had never spoken with Ms. Geurian at all. The initial exchange between Equitable and NCMS, the letter in which Mr. Frankhouser advised Ms. Geurian he was intending to cancel the contract, was sent from Pennsylvania to Kansas. He

48

testified that the parties exchanged several e-mail messages, none of which contains any language which can be interpreted as interfering with the putative contract between Nationwide and Equitable; in fact, Plaintiff is never mentioned in those e-mails. (*See* Geurian Aff., Exhs. 2-4.) Finally, there appears to have been only one actual telephone conversation between Mr. Frankhouser and Ms. Geurian, although they left voice-mail messages for each other an undisclosed number of times. (Decker Aff., Exh. B at 30-33.) Based on the guidance provided by IMO Indus. and Marten, we find these actions insufficient to establish the type of entry needed under the Calder effects test.

Second, there is no evidence Ms. Geurian knew at the time she made the comments that Nationwide was a Pennsylvania corporation or even that Equitable Resources was intending to cancel its contract with NCMS in favor or Nationwide. Mr. Rippert's letter of approximately May 3, 2007, in which he asked NCMS to remove all references to him from its website does not refer to Nationwide and the return address provided is in Hutchinson, Kansas. Mr. Rippert testified that he worked from his home in Kansas, not from the Nationwide offices in Pennsylvania. (Def.'s Reply, Exh. A at 15.) Neither the November 2007 letter from Mr. Frankhouser nor the e-mail communications between Ms. Geurian and Mr. Frankhouser refers to Nationwide or its principal place of business. Mr. Frankhouser also implied that during his conversation with Ms. Geurian, she

49

referred to Nationwide by name, but nothing in his testimony reflects her knowledge that Nationwide was resident in Pennsylvania. *Compare* Vector Security, 2003 U.S. Dist. LEXIS 6573 at *10-*12, holding that where the defendant knew from having sent 25 e-mail messages to the *plaintiff's* staff that its corporate headquarters was situated in the forum, defendant had expressly aimed its tortious actions at the forum.

Plaintiff relies on three cases for its argument that it has satisfied the third prong of the effects test. (Plf.'s Brief at 14.) In the first, Waimberg v. Medical Transp. of Am., Inc., 52 F. Supp.2d 511 (E.D. Pa. 1999), the plaintiff, a Pennsylvania resident, was offered a new job by a company being formed in California. After about two months of negotiation, he accepted a written offer of employment and resigned from his current job, only to learn ten days later that the offer was being rescinded because principals from an investment group which was funding the new company questioned his ability to do the job. Id. at 514. Among the claims in his subsequent lawsuit, Waimberg alleged tortious interference with a contract against the investor-group defendants, residents of Illinois, who challenged the jurisdiction of a Pennsylvania-based federal court. As pertains to the effects test analysis, the court noted that the defendants had satisfied the third prong because they sent letters by fax to Waimberg assuring him that the investment group would provide financial backing for

50

the newly formed company and directed several telephone calls to him in Pennsylvania. Thus, they had to know Waimberg was a Pennsylvania resident and, consequently, their subsequent interference with the contract was expressly directed at Pennsylvania. Id. at 516 and n.4. Based on Waimberg, Plaintiff argues that harming the plaintiff where he lives and works is often sufficient to satisfy this third prong, but, as discussed above, none of the evidence shows that Ms. Geurian knew Nationwide was a Pennsylvania resident.

Plaintiff's second and third cases serve him no better. In Fetter v. No. Am. Alcohols, Inc., CA No. 06-4088, 2007 U.S. Dist. LEXIS 11470 (E.D. Pa. Feb. 16, 2007), two of the three non-resident individual defendants who allegedly defamed the Pennsylvania plaintiff or interfered with his prospective employment contract with the corporate defendant had either (1) visited Fetter in Philadelphia on one or more occasions, (2) negotiated the first draft of the contract there, (3) exchanged multiple drafts of the employment contract from their location in Florida with plaintiff in Pennsylvania, and (4) made the alleged defamatory statements in Radnor, Pennsylvania. Moreover, the contract with which the defendants allegedly interfered was to be carried out in Pennsylvania. Id. at *22-*25. Consequently, the court held that the individual defendants had knowingly aimed their tortious activities at Pennsylvania. None of those types of contacts, or

51

even analogous events, are present in this case.

Finally, in Bank Express v. Kang, 265 F. Supp.2d 497 505 (E.D. Pa. 2003), the Pennsylvania plaintiff alleged that the defendant, a California resident, induced customers to cancel their automatic teller machine ("ATM") servicing contracts with the plaintiff, primarily as the result of two former Bank Express employees having formed a business relationship with the defendant. Id. at 500-501. The court concluded that because the plaintiff had averred it performed all of its services for its clients from its Pennsylvania offices, the alleged interference with its contracts was "expressly aimed" at Pennsylvania; moreover, the two former employees who had aided in the interference knew the plaintiff was based in Pennsylvania. Id. at 504-505. Here, by contrast, the evidence is clear that Nationwide does not perform all of its services from Pennsylvania; in particular, Mr. Rippert explicitly testified that he continued to work from his home in Kansas.

Third, Plaintiff's own allegations belie its argument that NCMS intentionally aimed its tortious conduct at Pennsylvania. That is, in addition to the allegation that Ms. Geurian conveyed a number of falsehoods to Mr. Frankhouser in Pennsylvania, it is also alleged that similar comments were made to Operator representatives in Ohio[9] and Texas. (Complaint, ¶22.) Accepting for purposes of

---

[9] We recognize Plaintiff has alleged in the verified Complaint that Ms. Geurian spoke to Ms. Myers in Washington, Pennsylvania. The only evidence submitted by either party on the question of Ms. Myers'

deciding the motion to dismiss that such conversations took place,[10] one can reasonably conclude that Ms. Geurian did not focus her remarks at Pennsylvania but rather at any location where there was a possibility Nationwide would compete with NCMS for Operators' contracts. Moreover, Plaintiff's allegations that Ms. Geurian made these remarks to residents of Texas and Ohio creates an even higher standard of proof on the question of whether Defendant focused its tortious behavior at Pennsylvania. If a defendant circulates a statement nationally, "the defendant can be said to have expressly aimed the statement at a particular state where there is a unique relationship between the state and the plaintiff's industry or business." Bank Express, 265 F. Supp.2d at 506, *citing* Imo Indus., 155 F.3d at 264 and n.7, and Remick, 238 F.3d at 259 (noting that contrary to the Supreme Court's example in Calder of the long-standing relationship between California and the film industry, Remick had "not asserted that Pennsylvania has a unique relationship with the boxing industry.") The court in Bank Express noted that the plaintiff had not asserted a unique relationship between the ATM servicing industry and Pennsylvania (id. at 506)

---

residence is her own testimony which indicates she lives and works in Ohio (Plf.'s Brief, Decker Aff., Exh. D at 5) and her affidavit (Def.'s Brief, Exh. D) which was sworn in Franklin County, Ohio. We conclude, in light of Defendant's evidence and the absence of other competent evidence to support Plaintiff's allegation, the discussion with Ms. Myers did not represent entry into Pennsylvania.

[10] We also note that Ms. Geurian, Ms. Myers, and Ms. Simmons all deny in their affidavits that such conversations took place and that Plaintiff has not come forward with evidence to refute these denials.

and, similarly, this Court is unaware of any unique relationship between Pennsylvania and the industry of monitoring drug and alcohol compliance programs or the oil and gas pipeline industry. We also note that Mr. Rippert sent out some 400 postcards announcing his departure from NCMS, apparently to Operators and Contractors throughout the United States, not only Pennsylvania. Coupled with the fact that he continued to work from Kansas, this evidence tends to show that the industry has no unique relationship or focus in Pennsylvania.

Finally, we are not convinced that Ms. Geurian's statements were "expressly aimed" at Nationwide, the only plaintiff in this matter. Accepting as true Mr. Frankhouser's deposition testimony, he recounted that Ms. Geurian

definitely represented that Mr. Rippert was subject to the noncompete; that if Equitable entered into an agreement with [Nationwide], he'd be in violation of that noncompete . . . [S]he told me that if I left NCMS and went to NCAS, and Rip had this noncompete enforced against him or he went bankrupt or went belly up, she was not taking my business back.

(Decker Aff., Exh. B at 59.) It appears to the Court that if Ms. Geurian's statements were expressly aimed at anyone, they were aimed at Mr. Rippert and only incidentally at Nationwide, inasmuch as the focus of her statements was the non-compete agreement which pertained only to Mr. Rippert.

We conclude Plaintiff has failed to show that Defendant's tortious activities were expressly aimed at Pennsylvania and,

54

consequently, has failed to support its allegations that Defendant is subject to the specific jurisdiction of this Court under the Calder effects test. Inasmuch as we have also concluded we do not have general jurisdiction over Defendant, we need not address the question of whether exercising jurisdiction would comport with the principles of fair play and substantial justice. Vetrotex Certainteed Corp., 75 F.3d at 153, n.9.

## V. TRANSFER

"Whenever a civil action is filed in a court . . . and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed." 28 U.S.C. § 1631 (transfer to cure want of jurisdiction); see also Gehling, 773 F.2d at 544 (conclusion that district court did not have jurisdiction over the defendant did not prevent the court from transferring case to the forum and venue in which it could have originally been brought.) The Court will therefore not dismiss this case entirely, but will transfer it to the District of Kansas. Neither of the parties has requested such a transfer, but we conclude it is within the our discretion to do so even in the absence of such a request. See Chicosky v. Presbyterian Medical Center, 979 F.Supp. 316, 320-323 (D.N.J. 1997), holding that transfer under 28 U.S.C. § 1631 is proper even if the parties did not invoke that provision.

55

Alternatively, this Court may transfer an action pursuant to 28 U.S.C. § 1406(a) despite the lack of personal jurisdiction over Defendant. Lafferty v. Gito St. Riel, 495 F.3d 72, 77 (3d Cir. Pa. 2007), citing Goldlawr Inc. v. Heiman, 369 U.S. 463, 465-466 (1962). Under 28 U.S.C. § 1406, a district court may transfer a case that was improperly filed in the wrong district to "any district or division in which it could have been brought" to further "the interests of justice."

Jurisdiction and venue are appropriate in Kansas because that State has general jurisdiction over Defendant inasmuch as its principal place of business is in Hutchinson, Kansas, and the events which allegedly led to the tortious interference claim (e.g., Ms. Geurian's statements regarding the non-compete agreement) occurred there. Similarly, the NCMS website which Plaintiff alleges contains false and misleading assertions about DOT approval allegedly in violation of the Lanham Act is controlled from Kansas. Third, Mr. Rippert, Plaintiff's president, resides in Kansas and presumably has access to the company's files and records, as well as to his own records, at that location.

In addition, we find no policy impediments to transferring this case to Kansas. Should Defendant be found liable to Nationwide for any of the claims brought against it, a money judgment will be easily enforceable in that jurisdiction. None of the claims require interpretation of unique Pennsylvania law and

there are no choice of law clauses requiring application of Pennsylvania law which would be potentially burdensome for a Kansas court. Moreover, transferring the case rather than dismissing it without prejudice will further the interests of justice because it will allow Nationwide to avoid the filing and service costs associated with refiling in Kansas. *See* Hlavac, 2005 U.S. Dist. LEXIS 6081 at *33; Lawman Armor Corp. v. Simon, 319 F. Supp.2d 499, 507 (E.D. Pa. 2004) ("Normally transfer will be in the interest of justice because dismissal of an action that could be brought elsewhere is time-consuming and justice-defeating.")

An appropriate Order follows.

June ___/0___, 2008

William L. Standish
United States District Judge